# Loan Agreement

This Agreement dated as of May 17, 2012 is between BALANCE POINT DIVORCE FUNDING, LLC, a Nevada limited liability company ("***Borrower***"), and DLCA, LLC, a Delaware limited liability company ("***Lender***"). Unless otherwise defined or the text otherwise requires, all terms used herein shall have the meanings specified in the Code.

## 1. CREDIT AMOUNT AND TERMS

1.1. **The Loan.** Lender agrees, on the terms and conditions set forth in this Agreement, to make loans (collectively, the "***Loans***") in the aggregate principal amount outstanding at any time of $1,000,000 (or such other amount as Lender may, in its absolute discretion) agree to lend, the ***"Loan Maximum")***. Borrower shall receive the Loans in disbursements (each, a "***Disbursement***") from time to time during the period commencing on the date of this Agreement and ending on the Maturity Date (such period, the "***Disbursement Period***"). The date on which a Disbursement is to be made is referred to herein as a "***Disbursement Date***"). Each Disbursement shall be in an amount of $50,000 or an integral multiple in excess thereof.

1.2. **Procedure for Disbursements.** The initial Disbursement, pursuant to the form of Disbursement Request that has been approved by Lender, will be made contemporaneous with the execution of this Loan Agreement provided that all of the conditions specified in Sections 5.1 and 5.2 have been satisfied by Borrower (the "***Effective Date***"). Thereafter Borrower shall give Lender a written notice of a Disbursement under this Agreement, by delivering a written request for a Disbursement substantially in the form of Exhibit B, appropriately completed (each, a "***Disbursement Request***") to Lender not later than 1:00 p.m. (EST) at least two Business Days before the Disbursement Date of the proposed Disbursement, specifying the amount of the proposed Disbursement and providing disbursement instructions.

1.3. **Payment Terms**

1.3.1. Borrower will pay all accrued but unpaid interest on the Disbursements on December 31 of each year, upon each prepayment and at maturity (whether by acceleration or otherwise).

1.3.2. Borrower will repay the principal amount of all Disbursements at maturity (whether by acceleration or otherwise).

*provided that*, to the extent not paid previously, the entire unpaid principal amount of the Disbursements and all other amounts outstanding hereunder shall be due and payable in full on the date (the "***Maturity Date***") that is the first to occur of (i) May 17, 2014 or such other date upon which Borrower's right to draw on the Loan shall have been extended in accordance with Section 9.10 or such other date as Lender may agree, (ii) upon acceleration after the occurrence of an Event of Default; or (iii) upon the expiration (or exhaustion) of the "Commitment" under the Flow Agreement, provided, however, that if the Commitment is terminated due to a "No-Fault Termination Event" under the Flow Agreement, Borrower shall not be required to repay the balance of the Loan until the period ("***Post-Commitment Period***") that begins on the occurrence of that No-Fault Termination Event and ends on the earlier of (x) the 270th day thereafter or (y) the occurrence of the Maturity Date under clauses (i) or (ii) above. Borrower shall pay interest that accrues during the Post-Commitment Period on the first day of each month.

1.4. **Prepayments**

1.4.1. Borrower may prepay the outstanding balance of the Loan in full at any time or in part from time to time without fee or penalty.

1.4.2. Each prepayment under Section 1.4 will be applied to sums outstanding under this Agreement in such order as Lender shall determine.

1.4.3. Borrower shall prepay the outstanding balance of the Loan by the amount of any loan, equity or other investment received by Borrower or any of its Affiliates from anyone other than Lender or any of its Affiliates, within one Business Day after receipt, other than an investment in an Affiliate for the limited purpose of funding the purchase price (and related expenses) of an interest in a case that the buyer does not have the right to acquire, or has elected not to acquire, under the Flow Agreement of this date between Borrower, as seller, and BP Case Management, LLC, as buyer (the "***Flow Agreement***"). "***Affiliate***", as used in this Agreement, means, with respect to any Party, any other entity, trust or person controlling, controlled by, or under common control with such Party; in such context, "control" means the possession, directly or indirectly, of the power to direct the management or policies of another, whether through the ownership of voting securities, by contract, or otherwise. Notwithstanding the foregoing, Principal shall not be an Affiliate of Borrower for purposes of this Section 1.4.3.

1.4.4. Borrower shall prepay the outstanding balance of the Loan within two (2) business days of receipt of any proceeds by Borrower or any of its Affiliates relating to the case set forth on Schedule 1.4, up to the amount for that case set forth on Schedule 1.4.

1.4.5. Borrower shall prepay the Loans by the amount by which the aggregate balance of the Loans exceeds the lesser of (x) the Loan Value of the Cases and (y) the Loan Maximum. The "***Loan Value of the Cases***" means twenty-five percent (25%), provided that following the first 30 days of the Post-Commitment Period that percentage will be fifty percent (50%), of the sum of:

(i) for each "***Purchased Case***" (as defined in the Flow Agreement), the median of the values set forth as the "Projected Range of Payment To Buyer" in article XI on the Valuation Worksheet for that Purchased Case under the Flow Agreement or otherwise prepared for such Rejected Case, *plus*

(ii) for each "***Rejected Case***" (as defined in the Flow Agreement) (x) in which an Affiliate of Lender has invested, the median, and (y) in which an Affiliate of Lender has not invested, seventy-five percent (75%) of the median, of the values set forth as the "Projected Range of Payment To Buyer" in article XI on the Valuation Worksheet for that Purchased Case under the Flow Agreement or otherwise prepared for such Rejected Case, provided that the value for each such Rejected Case (x) that does not have a completed Valuation Worksheet or similar document reflecting a projected range of values, or (x) in which Borrower's economic interest is not equal to Borrower's economic interest in the Purchased Cases, the value shall be as Lender, in its good faith discretion, shall determine unless Lender and Borrower have agreed to a value in an advance writing, provided further that the Loan Value of the cases in clause (y) shall not exceed twenty-five percent (25%) of the aggregate Loan Value *plus*

(iii) for the cases set forth on Schedule 1.4, the amount for each case set forth on that Schedule 1.4,

provided that for each of (i), (ii) and (iii), the value shall be reduced to reflect assets that have been liquidated, dissipated, consumed or impaired (from a liquidated collateral value perspective and otherwise) and as may be otherwise adjusted by Lender in its good faith discretion, based on events or circumstances occurring or disclosed after that valuation was made and based also on the amounts realized by Borrower in other cases as compared to the amounts projected by Borrower to be realized, *plus*

(iv) until December 15, 2012, $200,000 ("***Permitted Overadvance Amount***").

    1.4.6. Without limiting any other obligation that Borrower may have under any Loan Document, during any Post-Commitment Period, Borrower shall prepay the Loans by an amount equal to thirty three and one third percent (33 1/3 %) of all dividends, distributions and repayments that Borrower or any of its Subsidiaries receives on account of any investments in companies or cases arising from either the Flow Agreement or from Rejected Cases, including from BP Case Management, LLC, and Lender shall be authorized to direct such companies and payors with respect to such cases to make such payments directly to Lender.

1.5 **Operating Budget and Use of Proceeds.** Borrower agrees that it may use the proceeds of Disbursements only in the line of business it is conducting on the Effective Date which, as to Borrower, is limited to the business of investing in pending matrimonial cases in the states of California, New York and any other States for which Borrower has completed due diligence consistent with the "Investment Criteria" under the Flow Agreement ("***Existing Business***") provided that the amounts of such Disbursements and such uses are substantially in accordance with the Operating Budget.

1.5.1 **Control Account.** Without limiting any other obligation that Borrower may have under any Loan Document, during any Post-Commitment Period Borrower shall, deposit into a Control Account within two Business Days of receipt fifteen percent (15%) of all dividends, distributions and repayments that Borrower or any of its Subsidiaries receives on account of any investments in companies or cases arising from either the Flow Agreement or from Rejected Cases, including from BP Case Management, LLC, and Lender shall be authorized to direct such companies and payors with respect to such cases to make such payments directly to Lender. Until so deposited, Borrower shall receive and hold all of such funds in trust for Lender and not commingle any collections with any of its own funds. Borrower hereby grants to Lender a security interest in any such funds and any such Control Account. "Control Account" means a deposit account with a bank reasonably acceptable to Lender that executes a deposit account control agreement (or similar agreement) in form and substance satisfactory to Lender which, among other things, is sufficient to give to Lender a duly perfected security interest in such account and the deposits therein and the right to withdraw funds and give directions to the bank with respect to that account.

## 2. INTEREST RATES

### 2.1. In General.

2.1.1. **Interest Calculation.** All interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid at the rate applicable after an Event of Default, as provided in Section 2.1.3. Each interest rate specified or described in this Agreement is a rate per annum.

2.1.2. **Pre-default Interest Rate.** Disbursements will bear interest at a rate per annum equal to the "Prime Rate" as reported in the Wall Street Journal (NY edition) from time to time.

2.1.3. **Default Rate.** Upon the occurrence and during the continuation of any Event of Default under this Agreement, all amounts outstanding under this Agreement will, at the option of Lender, bear interest at a rate per annum equal to Four Percent (4%) in excess of the pre-default interest rate. This will not constitute a waiver of any Default. This may result in compounding of interest. Such interest shall be payable on demand.

2.2. **Usury Savings Clause.** Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "***Maximum Rate***"). If Lender receives interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loan or, if it exceeds such unpaid principal, refunded to Borrower. In determining whether the interest contracted for, charged, or received by Lender exceeds the Maximum Rate, Lender may, to the extent permitted by

applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Loan.

## 3. COLLATERAL

Borrower's obligations to Lender are to be secured by first priority liens against substantially all of Borrower's assets pursuant to the Security Agreement executed by Borrower.

## 4. DISBURSEMENTS, NOTE

4.1. **Disbursements and Payments.** Borrower shall sign the promissory note (the "***Note***") in the form of Exhibit A hereto. Each disbursement by Lender and each payment by Borrower will be evidenced by records kept by Lender, including the grid attached to the Note. Borrower authorizes Lender to record each such transaction on that grid.

4.2. **Telephone and Telecopied Authorization**

4.2.1. Lender may honor telephone or telecopied instructions for Disbursements or repayments given by any of the individuals authorized to sign loan agreements on behalf of Borrower, or any other individual designated by any one of such authorized signers.

4.2.2. Borrower hereby indemnifies and excuses Lender (including its officers, employees, and agents) against and from all liability, loss, and costs in connection with any act resulting from telephone or telecopied instructions it reasonably believes are made by any individual authorized by Borrower to give such instructions. This indemnity and excuse will survive this Agreement's termination.

4.3. **Business Days.** Unless otherwise provided in this Agreement, a "***Business Day***" is a day other than a Saturday, a Sunday or a day on which commercial banks located in New York and California are authorized or required by law or other governmental action to be closed. All payments and disbursements which would be due on a day which is not a Business Day will be due on the next Business Day, *provided that* if such day is after the Maturity Date, such payment shall be due on the preceding Business Day. All payments received on a day which is not a Business Day will be applied to the credit of Borrower on the next Business Day.

4.4. **Taxes.**

4.4.1. All payments made by Borrower under this Agreement and all other agreements, instruments and documents executed or delivered in connection with this Agreement or any other loan Document shall be made free and clear of, and without reduction for or on account of, any present or future tax, levy, impost, duty, charge, fee, deduction or withholding of any nature imposed by any governmental authority (collectively, "***Taxes***") required by law to be withheld from any amounts payable under the Loan Documents (other than a Tax imposed on or measured by the income or profits of Lender). In the event that Borrower is prohibited by law from making payments under the Loan Documents free of such deductions or withholdings, Borrower shall pay such additional amounts to Lender as may be necessary in order that the actual amounts received by Lender in respect of interest and any other amounts payable under the Loan Documents after such deduction or withholding (and after payment of any additional taxes or other charges due as a consequence of the payment of such additional amounts) shall equal the amount which would have been received if such deduction or withholding were not required.

    4.4.2. Borrower agrees to pay any current or future stamp or documentary Taxes and any other excise or property Taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or any amendment of, supplement to or modification of, or any waiver or consent under or in respect of, the Loan Documents or otherwise with respect to, the Loan Documents.

## 5. CONDITIONS

Lender must receive the following items, in form and substance acceptable to Lender, before it is required to extend any credit to Borrower under this Agreement:

### 5.1. CONDITIONS TO INITIAL DISBURSEMENT

5.1.1. **Authorizations.** Evidence that the execution, delivery and performance by Borrower of this Agreement and any other Loan Document have been duly authorized.

5.1.2. **Governing Documents.** Certified copies of Borrower's organizational documents including Borrower's certificate of formation and operating agreement.

5.1.3. **Security Agreement.** Signed original security agreement ("***Security Agreement***") executed by Borrower and each direct or indirect subsidiary of Borrower (i.e. a corporation, partnership, joint venture, limited liability company or other company or entity of any kind in which Borrower directly or indirectly owns or controls 50% or more of voting, equity or profit interests, other than the existing subsidiaries listed on Schedule 6.15, a "***Subsidiary***"), together with "***Collateral***" (as defined in the Security Agreement"), if any, in which Lender requires a possessory security interest pursuant to the Security Agreement).

5.1.4. **Evidence of Priority.** Evidence that security interests and liens in favor of Lender are valid, enforceable, and prior to all others' rights and interests, except those to which Lender consents in writing.

5.1.5. **Other Items.** Such other documents, each in form and substance reasonably satisfactory to Lender, as Lender shall reasonably require in connection with the making of the initial Disbursement.

### 5.2. CONDITIONS TO ALL DISBURSEMENTS

5.2.1. On the date of the each Disbursement (including the initial Disbursement) after giving effect to such Disbursement, (i) Borrower shall be in compliance with all of the terms, covenants and conditions of this Agreement and any other agreement, note, security agreement or document executed at any time in connection with this Agreement, including, without limitation, the Note and the Security Agreement (together with this Agreement, the "***Loan Documents***") to which it is a party, (ii) there shall exist no Event of Default or event which, with the giving of notice and/or passage time would constitute an Event of Default (such an event, a "***Default***"), (iii) the representations and warranties contained in the Loan Documents shall be true and correct with the same effect as though such representations and warranties had been made on the date of such Disbursement, except to the extent the same relate solely to an earlier date (in which case they shall continue to be true as of such date), (iv) no Material Adverse Change shall have occurred with respect to the Borrower since the date of the financial statements referred to in Section 6.6. As used in this Agreement and the other Loan Documents, "***Material Adverse Change***" shall mean a material adverse change in (i) the financial condition, operations, business, assets or property of the Borrower, (ii) the ability of Borrower Companies to perform its obligations under the Loan Documents to which it is party or (iii) the ability of Lender to enforce any Loan Documents against Borrower Companies.

5.2.2. Lender shall have received a Disbursement Request duly executed by Borrower.

5.2.3. Each new Subsidiary shall have complied with the requirements of Section 5.1.1- 5.1.5 as if those provisions were specifically addressed to that Subsidiary.

Each request for a Disbursement and the acceptance by Borrower of the proceeds thereof shall constitute a representation and warranty by Borrower, as of the date of such Disbursement, that the conditions specified in Section 5.2.1 have been satisfied.

**6.** REPRESENTATIONS AND WARRANTIES

When Borrower signs this Agreement, Borrower makes the following representations and warranties. Each request for a Disbursement constitutes a renewed representation.

6.1. Organization of Borrower. Borrower is a limited liability company duly formed and existing and in good standing under the laws of the state of Nevada.

6.2. Authorization. The execution and delivery of this Agreement and other Loan Documents, and any other instrument or agreement required hereunder, and the performance by Borrower of its obligations hereunder and thereunder are within Borrower's powers, have been duly authorized and do not conflict with any of its organizational documents.

6.3. Enforceable Agreement. Subject to the Enforceability Exception (as defined in the Flow Agreement), this Agreement and the other Loan Documents is a legal, valid and binding agreement of Borrower, against Borrower in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and subject to the Enforceability Exception, enforceable in accordance with its terms.

6.4. Good Standing. In each state in which Borrower does business, it is properly licensed or authorized, in good standing and, where required, in compliance with fictitious name statues.

6.5. No Conflicts. No Loan Document conflicts with any agreement, or obligation to which Borrower or any Subsidiary (Borrower and its Subsidiaries being collectively referred as the "*Borrower Companies*" and individually as a "***Borrower Company***") is a party or by which Borrower or its property is bound. To Borrower's knowledge, no Loan Document conflicts with any law to which Borrower or any Subsidiary is bound.

6.6. Financial Information. All historical financial and other information that has been or will be supplied to Lender, including Borrower's financial statement as of and for the period ended May 11, 2012 is true and correct, provided, however that Lender acknowledges that statements reflecting estimates of value of cases were made by Borrower in good-faith based on Borrower's then-current expectations and were based upon reasonable assumptions. Since the date of the last financial statements provided by Borrower to Lender, there has been no Material Adverse Change in Borrower.

6.7. Litigation. Except as described in that certain letter of this date from Borrower to Lender relating to this Agreement (the "***Disclosure Letter***"), there is no lawsuit, tax claim or other dispute pending or to the knowledge of Borrower, threatened against any material Borrower Company, which, if resolved in a manner adverse to any material Borrower Company, may impair any material Borrower Company's financial condition or ability to conduct its business as presently conducted or repay any Disbursement when due.

6.8. Collateral. All Collateral required by this Agreement is owned by the grantor of the security interest free of any liens or interest of others, other than Permitted Liens.

6.9. Permits, Franchises. Each Borrower Company possesses all material permits, memberships, franchises, contracts and licenses required and all trademark rights, patents rights and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

6.10. Other Obligations. No Borrower Company is in Default on any obligation for borrowed money, any purchase-money obligation or any other material lease, contract, instrument or obligation.

6.11. Income Tax Matters. No Borrower Company has knowledge of any pending assessments or adjustments for its income tax for any year.

6.12. No Tax Avoidance Plan. No Borrower Company is obtaining credit from Lender under this Agreement for the principal purpose of avoidance of U.S. withholding taxes.

6.13. No Event of Default. There is no event or circumstance which is a Default, or which is, or with notice or lapse of time or both would be, an Event of Default, under this Agreement.

6.14. **Location of Borrower.** Borrower's place of business (or, if Borrower has more than one place of business, its chief executive office) is located at the address listed under Borrower's signature on this Agreement.

6.15. **Subsidiaries and Affiliates.** Except as set forth on Schedule 6.15, Borrower:

(a) does not own or control a majority of the stock or voting interest of any other company;

(b) is not controlled by, or under common control with, any other company except that each Subsidiary is owned and controlled by Borrower; and

(c) is not in a joint venture or partnership with any other Company.

6.16. **Ownership and Management.** Except for interests granted to Lender hereunder, Stacey Napp ("***Principal***") (i) owns 100% of the equity and profits interests, and voting rights, of Borrower, free of any security interest lien, pledge, restriction, option or encumbrance of any kind and (ii) is the active, full time, chief executive officer of Borrower. Stacey Napp intends to transfer up to an aggregate of 20% ownership of Borrower to either trusts or family limited partnerships for estate planning purposes

6.17. **Cash Management System.** Borrower's deposit accounts and procedures for deposit and distribution of receipts, including the proceeds of Investment Cases, ("***Cash Management System***") are set forth on Schedule 6.17.

6.18. **Loan and Collateral Values.** The Loan Value of the Cases exceeds (and if a Disbursement is to be advanced, will continue to exceed) the aggregate balance of the Loans.

## 7. COVENANTS

Borrower agrees, until all principal and interest are repaid in full and Lender's commitment to make further Disbursements has been terminated:

7.1. Financial Information. To provide the following financial information and statements in form and substance reasonably acceptable to Lender, and such additional information as requested by Lender from time to time:

(a) as soon as available and in any event within sixty (60) days after the end of each of the first three (3) quarters of each fiscal year of Borrower, (commencing with the quarter ended September 30, 2012), copies of its consolidated financial statements, which will include a balance sheet for the applicable fiscal quarter and the related statements of

income for the applicable fiscal quarter, (which will not include footnotes), in each case, compiled internally and certified by the chief executive officer of Borrower;

(b) as soon as available and in any event one hundred twenty (120) days after the end of each fiscal year of the Borrower, copies of its consolidated financial statements, which will include a balance sheet for the applicable fiscal year end and the related statements of income for the applicable fiscal year end (which will not include footnotes), in each case, compiled internally and certified by the chief executive officer of Borrower;

(c) concurrently with the delivery of the items described in clauses (a) and (b) of this Section 7.1, a certificate of the chief executive officer of Borrower stating that she has reviewed the relevant terms of this Agreement and has made, or caused to be made, a review of the transactions and conditions of Borrower during the period since the last financial information delivered pursuant to this Section, that the review has not disclosed the existence of any Default or, if any such event exists, describing its nature and what action Borrower has taken and is taking with respect thereto;

(d) by December 15th of each year, Borrower's annual consolidated cash budget ("***Operating Budget***") for the following year, which shall be in form and substance reasonably acceptable to Lender;

(e) within ten days of the end of each calendar month in which a Disbursement has not been made within the last 15 days of that month, a calculation of the Loan Value of the Cases as of the last day of that month, in the form of the schedule to the Disbursement Request, certified by the chief executive officer of Borrower;

(f) any reports, budgets or other information delivered by Borrower to the counterparty under the Flow Agreement simultaneously with such delivery and this Agreement shall constitute Borrower's irrevocable authorization that Lender may receive from that counterparty, and share with that counterparty and its successors and assigns, any information regarding Borrower; and

(g) if requested by Lender, copies of bank statements for periods specified by Lender, to the extent that those statements are available to Borrower.

7.2. **Other Debts.** Not incur or permit to remain outstanding any direct or contingent liabilities or lease obligations (nor permit any Subsidiary to the same, other than those to Lender), or become liable (or permit any Subsidiary to become liable) for the liabilities of others without Lender's prior written consent, in Lender's sole discretion. This does not prohibit:

(a) acquiring supplies or services on normal trade credit terms in accordance with the Operating Budget;

(b) endorsing negotiable instruments received in the usual course of business;

(c) obtaining surety bonds in the usual course of business; and

(d) liabilities and leases disclosed on the Borrower's Operating Budget and May 11, 2012 financial statement.

7.3. **Other Liens.** Not to, (or permit any Subsidiary to) create, assume, or allow to exist any security interest or lien (including judicial liens) on property Borrower now owns or hereafter acquires, except the following ("***Permitted Liens***"):

(a) liens, encumbrances and security interests in favor of Lender;

    (b)    liens for taxes not yet due;

    (c)    liens in respect of judgments not constituting an Event of Default under Section 8;

    (d)    unexercised common law bankers' liens; and

    (e)    liens outstanding on the date of this Agreement that are being paid off by the closing disbursement.

7.4. **Notices to Lender.** To promptly notify Lender within five days of the occurrence of:

    (a)    any lawsuit seeking monetary damages in excess of $50,000 against any Borrower Company;

    (b)    any material dispute or claim (of any kind or from any person) arises with respect to any Purchased Case;

    (c)    any written claim that Borrower's interest in any Purchased Case is not enforceable in any material respect;

    (d)    any decrease by 15% in the value to Borrower or Lender of any Purchased Case from the value listed on the last schedule of Loan Value of the Cases provided to Lender, whether pursuant to a Disbursement Request or Section 7.1(f).

    (e)    any Default or Event of Default;

    (f)    any event or condition occurs which results in a Material Adverse Change with respect to any material Borrower Company, or in a reduction of 20% or more of the value of the Collateral;

    (g)    any change in Borrower's (or any future guarantor's) name, legal structure, place of business, jurisdiction of formation or, if Borrower (or any future guarantor) has more than one place of business, chief executive office, provided that, notwithstanding any other time for notice specified above, this notice shall be at least 20 days in advance of any such event;

    (h)    the creation of any Subsidiary not previously disclosed to Lender, and together with that disclosure, deliver all guaranties, security agreements and all other documents, and meet all other requirements with respect to that Subsidiary, as Lender may establish; and

    (i)    the receipt of any proceeds with respect to any Purchased Case or any other investments in any litigation, claim, settlement or judgment managed, serviced or originated by Borrower.

7.5. **Books and Records.** To maintain, and cause each Subsidiary to maintain, adequate books and records.

7.6. **Audits.** To allow, and cause each Subsidiary to allow, Lender and its agents to inspect its properties and examine, audit and make copies of its books and records at any reasonable time. If any properties, books or records are in the possession of a third party, the Borrower authorizes such third party to permit Lender and its agents to have access to perform inspections or audits and to respond to Lender's requests for information concerning such properties, books and records. Lender has no duty to inspect Borrower's properties or to examine, audit or copy books and records and Lender shall not incur any obligation or liability by reason of not making any such inspection or inquiry. In the event that Lender inspects properties or examines, audits or copies books and records, Lender will be acting solely for the purposes of protecting Lender's security and preserving Lender's rights under this Agreement. Neither Borrower nor

anyone else is entitled to rely on any inspection or other inquiry by Lender. Lender owes no duty of care to protect Borrower or anyone else against, or to inform Borrower or anyone else of, any adverse condition that may be observed as affecting any properties or business.

7.7. **Compliance with Laws.** To, and cause each Subsidiary to, comply with the laws, regulations, and orders of any government body with authority over its business.

7.8. **Preservation of Existence and Rights.** To maintain and preserve its existence and all rights, privileges, and franchises it now has or requires to operate its business.

7.9. **Maintenance of Properties.** To, and cause each Subsidiary to, protect, preserve and maintain its properties in good working condition (ordinary wear and tear excepted).

7.10. **Perfection of Liens.** To, and cause each Subsidiary to, assist Lender in perfecting and protecting its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

7.11. **Cooperation.** To, and to cause each Subsidiary to, take any action reasonably requested by Lender to carry out the intent of any Loan Document.

7.12. **General Business Insurance.** To, and to cause each Subsidiary to, maintain insurance satisfactory to Lender as to amount, nature and carrier, covering property damage (including loss of use and occupancy) to its properties, liability insurance including coverage for contractual liability, and workers' compensation, and any other insurance which is usual for its business.

7.13. **Additional Negative Covenants**. Not to, nor permit any Subsidiary to, without Lender's prior written consent:

(a) engage in any business activities substantially different from its Existing Business;

(b) liquidate or dissolve its business;

(c) enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company;

(d) sell, assign, lease, transfer or otherwise dispose of any assets, other than sales of non-material assets in the ordinary course of business for fair market value;

(e) enter into any sale-and-leaseback agreement covering any of its fixed or capital assets;

(f) acquire or purchase a business or a material portion of its assets;

(g) during (i) any Post-Commitment Period, (ii) so long as any Event of Default has occurred and is continuing or (iii) so long as Borrower would be obligated to make a Loan prepayment but for the inclusion of any portion of the Permitted Overadvance Amount in calculating the Loan Value of the Cases, make any distributions, declare any dividends, redeem any equity interests or issue any stock or other equity interests; or

(h) make any material changes to its Cash Management System .

7.14 **Life Insurance On Principal.** To apply for, acquire and maintain "Key-Man" life insurance on Principal in the amount of $1,000,000, and with insurers, reasonably satisfactory to Lender, provided in no event shall Lender be entitled to any life insurance benefit in excess of the amount of outstanding principal and interest of the Loans and other sums that it is entitled to collect under this Agreement.

## 8. DEFAULT

Notwithstanding any other provisions in this Agreement to the contrary, if any of the following events occurs (each, an "***Event of Default***"), Lender may do one or more of the following in any order and in any combination: declare Borrower to be in default, terminate Lender's obligations under this Agreement including to stop, or terminate its obligation to make, further Disbursements to Borrower, and require Borrower to repay the Loans and all other amounts outstanding under this Agreement immediately and without prior notice. If an Event of Default occurs under the paragraph entitled "Bankruptcy," below, with respect to Borrower, then the Disbursements and all other amounts outstanding under this Agreement will automatically be due immediately.

8.1. **Failure to Pay Principal.** Borrower fails to make any payment of principal under this Agreement when due, which failure is not cured within five days of written notice from Lender, provided that Lender is not obligated to provide notice of a default in a scheduled payment more than two times in any consecutive six month period.

8.2. **Failure to Pay Interest or Other Amounts.** Any Borrower Company fails to make any payment of interest, fees, expenses or other amounts payable under any Loan Document, which failure is not cured within ten days of written notice from Lender, provided that Lender is not obligated to provide notice of a default in a payment more than two times in any consecutive six month period.

8.3. **Lien Priority.** Lender fails to have an enforceable first-priority lien (except for any prior liens to which Lender has consented in writing) on or security interest in any property given as security for any Loans.

8.4. **Certain Covenants. Any Borrower Company** shall fail to observe or perform any covenant or agreement contained in Section, 7.2, 7.3, 7.4, 7.5, 7.6, 7.8, 7.12, 7.13, or 7.14.

8.5. **Other Covenants.** Any Borrower Company shall fail to observe or perform any other material term, covenant, or agreement contained in any Loan Document to which it is a party, which failure shall have continued unremedied for a period of 10 days in the case after the occurrence thereof in the case of a breach of Section 7.1, and 30 days after the occurrence thereof in the case of a breach of any other Section or Default not addressed in this Section 8.

8.6. **Representations.** Any representation, warranty, certification or statement made by any Borrower Company (or any of its officers) in, or in connection with, any Loan Document to which it is a party, or in any certificate, financial statement or other document delivered or to be delivered by it pursuant thereto, shall prove to have been incorrect or misleading in any material respect when made or deemed made.

8.7. **Bankruptcy.** Any Borrower Company or Principal files a bankruptcy petition, a bankruptcy petition is filed against any Borrower Company or Principal or any Borrower Company or Principal makes a general assignment for the benefit of creditors, which, in the case of any such proceeding filed against it, remains undismissed for a period of 30 days.

8.8. **Receivers.** A receiver or similar official is appointed for any Borrower Company's business or any substantial portion of its property, or its business is terminated.

8.9. **Judgments.** Any judgments or arbitration awards are entered against any Borrower Company or Principal, or any Borrower Company or Principal enters into any settlement agreements with respect to any litigation or arbitration, in an aggregate amount of $50,000 or more; *provided, however*, that any such judgment or order shall not give rise to an Event of Default under this Section 8.9 until 30 days after entry or agreement, as the case may be, and if and for so long as (A) the amount of such judgment or order is covered by a valid and binding policy of insurance between the defendant and the insurer, which shall be rated at least "A" by A.M. Best Company, covering full payment thereof and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment or order in excess of any insurance coverage .

8.10. **Material Adverse Change.** A Material Adverse Change occurs with respect to Borrower.

8.11. **Cross-default.** Any "Seller Termination Event" occurs under the Flow Agreement.

8.12. **Default Under Related Documents.** Any Loan Document required by this Agreement is violated or no longer in effect (other than by reason of its termination or release with the consent of Lender).

8.13. **Change in Ownership or Management.** (a) Any merger or consolidation of Borrower into or with another entity, (b) any sale of all or substantially all of the assets of Borrower, (c) any other transaction or series of transactions pursuant to, or as a result of, which Principal no longer owns 100% of the equity interests of Borrower; provided that principal shall be permitted to transfer up to 20% of the equity interests in Borrower to a trust or similar entity for the benefit of principal and/or her descendants or (d) Principal ceases to be the active, full time chief executive officer of Borrower.

## 9. ENFORCING THIS AGREEMENT; MISCELLANEOUS

9.1. **Applicable Law.** This Agreement is governed by Delaware law.

9.2. **Successors and Assigns.** This Agreement is binding on Borrower's and Lender's successors and assigns. Borrower agrees that it may not assign this Agreement without Lender's prior written consent, which Lender may withhold in its sole and absolute discretion. Lender may sell participations in or assign this Agreement and the other Loan Documents to any Affiliate, and after an Event of Default to anyone else, and may pledge its rights hereunder in connection with financing that it may obtain, and may exchange financial information about Borrower with actual or potential participants or assignees; provided that such actual or potential participants or assignees shall agree to treat all financial information so exchanged as confidential. If a participation is sold or the loan is assigned, the purchaser will have the right of set-off against Borrower. The failure of the ultimate corporate parent of Lender (as of the date of this Agreement) to retain a direct or indirect controlling interest in Lender shall be deemed to be an assignment by Lender of its interest in this Agreement to a non-Affiliate which shall be a material breach of this Agreement.

9.3. **Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. Lender retains all rights, even if it makes a Disbursement at a time when a Default or Event of Default exists. If Lender waives a Default or Event of Default under any provision of this Agreement, it may enforce its rights with respect to a subsequent Default or Event of Default under the same or a different provision of this Agreement. Any consent or waiver under this Agreement must be in writing and signed by Lender.

9.4. **Attorneys' Fees.** Borrower shall reimburse Lender for any costs and attorneys' fees incurred by the Lender after and during the continuance of an Event of Default in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and including any amendment, waiver, "workout" or restructuring under this Agreement. In the event that any case is commenced by or against Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Lender is entitled to recover costs and attorneys' fees incurred by the Lender related to the preservation, protection, or enforcement, of any rights of the Lender in such a case.

9.5. **Single Agreement.** Except for the NDA, this Agreement and the other Loan Documents collectively:

(a) represent the sum of the understandings and agreements between Lender and Borrower concerning the Loan; and

(b) replace any prior or contemporaneous oral or written agreements between Lender and Borrower concerning this credit; and

       (c)    are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

9.6. **Indemnification.** Borrower will indemnify and hold harmless Lender from any loss, liability, damages, judgments and costs of any kind relating to or arising directly or indirectly out of (a) its breach of this Agreement, any Loan Document or any document required hereunder or thereunder, (b) any credit extended or committed by Lender to Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees. This indemnity extends to each party, its parent, subsidiaries and affiliates, and all of their directors, officers, employees, agents, successors, attorneys, and assignees. This indemnity excludes amounts to the extent that they are attributable to the intentional misconduct or gross recklessness of Lender. This indemnity will survive repayment of attorneys' fees, Borrower's obligations to. All sums due pursuant to this Section shall be due and payable on demand.

9.7. **Notices.** All notices required under this Agreement shall be personally delivered, delivered by telecopier, delivered by facsimile or sent by first class mail, postage prepaid, to the addresses on the signature page of this Agreement, or to such other addresses as Lender and Borrower may specify from time to time in writing.

9.8. **Headings.** Section headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

9.9. **Counterparts.** This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement.

9.10. **Term Extension.** On at least 20 days notice prior to the end of the original Disbursement Period, Borrower may request Lender to extend the Disbursement Period for a period up to an additional twenty four months (but not beyond the expiration of the "Commitment" under the Flow Agreement) so long as Borrower (i) has sold Purchased Cases (pursuant to the terms of the Flow Agreement) with an aggregate purchase price equal to or greater than $1,500,000, (ii) no Default or Event of Default has occurred and is continuing, (iii) neither Borrower nor any of its Affiliates has received any loan, equity or other investment or has entered into an agreement to receive, or with respect to the receipt, any of the foregoing, in violation of this Agreement; (iv) all conditions set forth in Section 5.2 have been met and (v) Principal has provided a personal certification that these conditions have been met.

9.11. **Principles of Interpretation.** Unless otherwise indicated to the contrary herein by the context or use thereof: (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular section or paragraph hereof; (ii) words importing the masculine gender shall also include the feminine and neutral genders, and vice versa; (iii) words importing the singular shall also include the plural, and vice versa; (iv) the word "including" (and variations thereof) shall be interpreted as if followed by the words "without limitation" (v) references to "either" shall be interpreted as if followed by the words "one or both" and (vi) reference to an instrument, document or other agreement of any kind includes reference to its permitted supplements, amendments, restatements and other modifications.

9.12. **Consent to Jurisdiction.** Borrower and Lender irrevocably submit to the jurisdiction of any Delaware State or federal court sitting in the State of Delaware over any suit, or proceeding arising out of or relating to this Agreement and waive any objection that a suit or proceeding brought in such a court is in an inconvenient forum. The preceding sentence does not prevent Lender from bringing suit in any other court having jurisdiction.

9.13. **WAIVER OF JURY TRIAL. EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**This Agreement is executed as of the date stated at the top of the first page**

**LENDER:**

**DLCA, LLC**

Name: Gary Stern
Title: Chief Executive Officer

Address where notices to Lender are to be sent:

210 Sylvan Avenue
Englewood Cliffs, NJ 07632
Attn: Gary Stern

**BORROWER:**

**BALANCE POINT DIVORCE FUNDING, LLC**

By: ______________________
Name: Stacey Napp
Title: Chief Executive Officer

Address where notices to Borrower are to be sent:

9595 Wilshire Blvd.
Suite 900
Beverly Hills, California
Attn: Stacey Napp

*[SIGNATURE PAGE TO LOAN AGREEMENT]*

This Agreement is executed as of the date stated at the top of the first page

**LENDER:**

**DLCA, LLC**

Name: Gary Stern
Title: Chief Executive Officer

Address where notices to Lender are to be sent:

210 Sylvan Avenue
Englewood Cliffs, NJ 07632
Attn: Gary Stern

**BORROWER:**

**BALANCE POINT DIVORCE FUNDING, LLC**

By:
Name: Stacey Napp
Title: Chief Executive Officer

Address where notices to Borrower are to be sent:

9595 Wilshire Blvd.
Suite 900
Beverly Hills, California
Attn: Stacey Napp

*[SIGNATURE PAGE TO LOAN AGREEMENT]*

## LOCATION OF DEFINED TERMS

| Defined Term | Section |
|---|---|
| Affiliate | 1.4.3 |
| Borrower | Caption |
| Borrower Company | 6.5 |
| Business Day | 4.3 |
| Cash Management System | 6.17 |
| Default | 5.2.1 |
| Disbursement | 1.1 |
| Disbursement Date | 1.1 |
| Disbursement Period | 1.1 |
| Disbursement Request | 1.2 |
| Disclosure Letter | 6.7 |
| Effective Date | 1.2 |
| Event of Default | 5.2.1 |
| Existing Business | 1.5 |
| Flow Agreement | 1.4.3 |
| Lender | Caption |
| Loan Documents | 5.2.1 |
| Loan Maximum | 1.1 |
| Loan Value of the Cases | 1.4.5 |
| Loans | 1.1 |
| Material Adverse Change | 5.2.1 |
| Maturity Date | 1.3 |
| Maximum Rate | 2.2 |
| Note | 4.1 |
| Operating Budget | 7.1(e) |
| Permitted Lien | 7.3 |
| Permitted Overadvance Amount | 1.4.5 |
| Post-Commitment Period | 1.3 |
| Prime Rate | 2.1.2 |
| Principal | 6.16 |
| Purchased Case | 1.4.5 |
| Security Agreement | 5.1.3 |
| Subsidiary | 5.1.3 |
| Taxes | 4.4.1 |

SCHEDULES AND EXHIBITS

| Schedules: | |
|---|---|
| 1.4 | Existing Cases/Mandatory Prepayment |
| 5.1 | Subsidiaries |
| 6.17 | Cash Management System |

| Exhibits: | |
|---|---|
| A | Promissory Note |
| B | Disbursement Request |